**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| CRAIG TITUS,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>ROMEO ARANAS, *et al.*,<br><br>　　　　　Defendants. | 3:18-cv-00146-MMD-CLB<br><br>**REPORT AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE**[1] |

This case involves a civil rights action filed by Plaintiff Craig Titus ("Titus") against Defendants James Dzurenda, Kim M. Adamson, Renee Baker, Quentin Byrnes, and Romeo Aranas (collectively referred to as "Defendants"). Currently pending before the court is Defendants' motion for summary judgment. (ECF Nos. 29, 31.)[2] Titus opposed the motion (ECF No. 34), and Defendants replied (ECF No. 35). Also before the court is Titus's motion for new and updated testing (ECF No. 37). Defendants responded (ECF No. 38), and Titus replied (ECF No. 39). Having thoroughly reviewed the record and papers, the court hereby recommends Defendants' motion for summary judgment (ECF No. 29) be granted and the motion for testing (ECF No. 37) be denied as moot.

**I.    BACKGROUND AND PROCEDURAL HISTORY**

Titus is an inmate in the custody of the Nevada Department of Corrections ("NDOC") and is currently housed at the Lovelock Correction Center ("LCC"). (ECF No. 1-2). Proceeding *pro se*, Titus filed the instant civil rights action pursuant to 42 U.S.C. § 1983 in the First Judicial District Court of the State of Nevada, alleging three claims and

---

[1]    This Report and Recommendation is made to the Honorable Miranda M. Du, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4.

[2]    ECF No. 31 consists of sealed documents filed in support of the motion for summary judgment.

seeking injunctive relief and monetary damages. (*Id.*) On April 4, 2018, Defendants filed a petition for removal in this Court (ECF No. 1).

Pursuant to 28 U.S.C. §1915A(a), the District Court screened Titus's complaint on May 10, 2019. (ECF No. 7). The District Court allowed Titus to proceed on the portion of Counts I and II that alleged Eighth Amendment deliberate indifference to serious medical needs against Defendants and the portion of Counts I and II that alleged Fourteenth Amendment equal protection violations against Defendant Aranas. (*Id.*) The District Court dismissed, without prejudice, but without leave to amend, the portion of Counts II and III that alleged medical malpractice and professional negligence. (*Id.*)

### A. Allegations in the Complaint

The complaint alleges the following: During October through December 2015, Titus notified Dr. Adamson that he was experiencing extreme fatigue with no drive or energy regardless of the amount of sleep. (ECF No. 1-2 at 4.) He also stated that he was suffering from mental and emotional distress, extreme depression, forgetfulness, painful headaches, night sweats, hot flashes, severe joint pain, and the inability to achieve an erection. (*Id.*) In January 2016, Titus had an appointment with Dr. Adamson. (*Id.* at 5.) Titus explained, prior to incarceration, he was a "certified, world-class, professional bodybuilder" for almost 20 years and had used performance enhancing drugs and synthetic testosterone from 1986 to 2004. (*Id.*) Dr. Adamson found Titus's testosterone levels were below 350 ng/dL. (*Id.* at 6.) These levels were "clinically significant" and absent treatment Titus could lose bone density and develop diabetes. (*Id.*) Titus's body would also begin to retain less hydrogen and build up hydroxybutyric acid in his urine causing dehydration, heart disease, and bone dryness. (*Id.*)

Dr. Adamson ordered a blood draw to analyze Titus's testosterone levels but failed to follow through. (*Id.*) After filing four medical kites requesting the results of his blood work and presenting two medical kites in person at sick call, Titus learned the results of his blood work six months later. (*Id.* at 7.) According to Titus, it was well known that LCC

medical staff Roselle Donnelly, Brian Hegge, and Ballentine routinely disregarded medical doctors' orders and acted on their own accord. (*Id.*)

On July 17, 2016, when Titus finally met with Dr. Adamson about his blood results, Titus's symptoms were worse. (*Id.* at 8.) Titus's January 2016 blood results indicated his testosterone levels were at 330 ng/dL which was regarded as "clinically harmful." (*Id.*) Dr. Adamson stated Titus's levels had to be even lower than that given the test results were six months old. (*Id.*) The average testosterone levels in men are 679 ng/dL and are usually higher in males in their fifties. (*Id.*) Due to the levels being "alarmingly low," Dr. Adamson stated he was going to administer testosterone replacement therapy ("TRT") beginning on July 18, 2016. (*Id.*) Dr. Adamson advised Titus he would receive 200 mg depo-testosterone injections every Monday for six weeks followed by 200 mg depo-testosterone injections every two weeks for another four injections. (*Id.* at 8-9.) Dr. Adamson stated he would analyze Titus's blood at the end of the treatment to establish Titus's testosterone levels. (*Id.* at 9.)

On July 18, 2016, Titus went to sick call, as instructed by Dr. Adamson, but a nurse turned Titus away stating Titus's TRT had been denied. (*Id.*) It was well known that the nurses at LCC tampered with doctors' orders without the doctors' knowledge. (*Id.*) On July 19, 2016, Titus had an appointment with Dr. Adamson and Aranas. (*Id.* at 14.) Together, they discussed Titus's symptoms and current physical and medical condition. (*Id.* at 14-15.) Dr. Adamson told Aranas of his professional opinion to implement TRT to Titus but Aranas stated, "if we give him testosterone therapy, he'll want it again later." (*Id.* at 15.) Dr. Adamson pointed out Titus's levels were dangerously low, reiterated implementing TRT, and discussed Titus's symptoms. In response, Aranas stated, "he has enough testosterone." (*Id.*)

Dr. Adamson later informed Titus that Aranas agreed to TRT to begin on July 25, 2016. (*Id.*) However, when Titus went to his scheduled appointment on that day, Dr. Adamson told Titus that Aranas had denied TRT after all. (*Id.* at 15-16.) Dr. Adamson urged Titus to file a grievance in order to receive TRT as soon as possible. (*Id.*) Dzurenda,

Baker, and Byrne were aware of Titus's medical needs through grievances but failed to intervene. (*Id.* at 16-18.) On two separate occasions, Dr. Adamson diagnosed Titus with hypogonadism. (*Id.* at 22.)

Titus alleges an Eighth Amendment deliberate indifference to serious medical needs claim based on Defendants knowing Titus needed TRT because his testosterone levels were clinically harmful, yet they denied his ability to get treatment. Titus also alleges a Fourteenth Amendment equal protection claim against Defendant Aranas based on Aranas only approving hormone therapy for transgender or gay inmates.

### B. Defendants' Motion for Summary Judgment

On March 26, 2020, Defendants filed the instant motion for summary judgment. (ECF No. 29.) Defendants assert they are entitled to summary judgment because: (1) Titus cannot establish deliberate indifference; (2) Titus cannot show Defendants discriminated against him because he is not in a protected class; (3) Baker, Byrne, and Dzurenda did not personally participate in the alleged violations; and, (4) Defendants are entitled to qualified immunity. (*Id.*) Titus filed an opposition to the motion for summary judgment (ECF No. 34), and Defendants replied (ECF No. 35). The recommended disposition follows.

## II.   LEGAL STANDARD

Summary judgment allows the court to avoid unnecessary trials. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). The court properly grants summary judgment when the record demonstrates that "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A dispute is "genuine" only where a reasonable jury could find for the nonmoving party. (*Id.*) Conclusory statements, speculative opinions, pleading

allegations, or other assertions uncorroborated by facts are insufficient to establish a genuine dispute. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007); *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996). At this stage, the court's role is to verify that reasonable minds could differ when interpreting the record; the court does not weigh the evidence or determine its truth. *Schmidt v. Contra Costa Cnty.*, 693 F.3d 1122, 1132 (9th Cir. 2012); *Nw. Motorcycle Ass'n*, 18 F.3d at 1472.

Summary judgment proceeds in burden-shifting steps. A moving party who does not bear the burden of proof at trial "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element" to support its case. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Ultimately, the moving party must demonstrate, on the basis of authenticated evidence, that the record forecloses the possibility of a reasonable jury finding in favor of the nonmoving party as to disputed material facts. *Celotex*, 477 U.S. at 323; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002). The court views all evidence and any inferences arising therefrom in the light most favorable to the nonmoving party. *Colwell v. Bannister*, 763 F.3d 1060, 1065 (9th Cir. 2014).

Where the moving party meets its burden, the burden shifts to the nonmoving party to "designate specific facts demonstrating the existence of genuine issues for trial." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citation omitted). "This burden is not a light one," and requires the nonmoving party to "show more than the mere existence of a scintilla of evidence. . . . In fact, the non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." (*Id.*) (citations omitted). The nonmoving party may defeat the summary judgment motion only by setting forth specific facts that illustrate a genuine dispute requiring a factfinder's resolution. *Liberty Lobby*, 477 U.S. at 248; *Celotex*, 477 U.S. at 324. Although the nonmoving party need not produce authenticated evidence, Fed. R. Civ. P. 56(c), mere assertions, pleading allegations, and "metaphysical doubt as to the

material facts" will not defeat a properly-supported and meritorious summary judgment motion, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

For purposes of opposing summary judgment, the contentions offered by a *pro se* litigant in motions and pleadings are admissible to the extent that the contents are based on personal knowledge and set forth facts that would be admissible into evidence and the litigant attested under penalty of perjury that they were true and correct. *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004).

### III. DISCUSSION

#### A. Civil Rights Claims under 42 U.S.C. § 1983

42 U.S.C. § 1983 aims "to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights." *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006) (quoting *McDade v. West*, 223 F.3d 1135 1139 (9th Cir. 2000)). The statute "provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights[,]" *Conn v. Gabbert*, 526 U.S. 286, 290 (1999), and therefore "serves as the procedural device for enforcing substantive provisions of the Constitution and federal statutes." *Crumpton v. Almy*, 947 F.2d 1418, 1420 (9th Cir. 1991). Claims under section 1983 require a plaintiff to allege (1) the violation of a federally-protected right by (2) a person or official acting under the color of state law. *Warner*, 451 F.3d at 1067. Further, to prevail on a § 1983 claim, the plaintiff must establish each of the elements required to prove an infringement of the underlying constitutional or statutory right.

#### B. Eighth Amendment – Deliberate Indifference to Serious Medical Needs

The Eighth Amendment "embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency" by prohibiting the imposition of cruel and unusual punishment by state actors. *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (internal quotation omitted). The Amendment's proscription against the "unnecessary and wanton infliction of pain" encompasses deliberate indifference by state officials to the medical needs of prisoners. *Id.* at 104 (internal quotation omitted). It is thus well established that "deliberate

indifference to a prisoner's serious illness or injury states a cause of action under § 1983." *Id.* at 105.

Courts in the Ninth Circuit employ a two-part test when analyzing deliberate indifference claims. The plaintiff must satisfy "both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (internal quotation omitted). First, the objective component examines whether the plaintiff has a "serious medical need," such that the state's failure to provide treatment could result in further injury or cause unnecessary and wanton infliction of pain. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). Serious medical needs include those "that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Colwell*, 763 F.3d at 1066 (internal quotation omitted).

Second, the subjective element considers the defendant's state of mind, the extent of care provided, and whether the plaintiff was harmed. "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment." *Hallett v. Morgan,* 296 F.3d 732, 744 (9th Cir. 2002) (internal quotation omitted). However, a prison official may only be held liable if he or she "knows of and disregards an excessive risk to inmate health and safety." *Toguchi v. Chung*, 391 F.3d 1050, 1057 (9th Cir. 2004). The defendant prison official must therefore have actual knowledge from which he or she can infer that a substantial risk of harm exists, and also make that inference. *Colwell*, 763 F.3d at 1066. An accidental or inadvertent failure to provide adequate care is not enough to impose liability. *Estelle*, 429 U.S. at 105–06.

Moreover, the medical care due to prisoners is not limitless. "[S]ociety does not expect that prisoners will have unqualified access to health care…." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). Accordingly, prison officials are not deliberately indifferent simply

7

because they selected or prescribed a course of treatment different than the one the inmate requests or prefers. *Toguchi*, 391 F.3d at 1058. Only where the prison officials' "'chosen course of treatment was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to the prisoner's health,'" will the treatment decision be found unconstitutionally infirm. *Id.* (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)). In addition, it is only where those infirm treatment decisions result in harm to the plaintiff—though the harm need not be substantial—that Eighth Amendment liability arises. *Jett*, 439 F.3d at 1096.

As to the objective element, Defendants do not appear to dispute that Titus was diagnosed with hypogonadism. (*See* ECF No. 31-4 at 2-3 (Progress Note entries for 9/19/2017, 7/25/16, and 7/14/16 referring to Hypogonadism).) Based on their lack of argument, it appears Defendants concede that it is a serious medical condition for purposes of Titus's claim. Thus, the court finds the objective element of deliberate indifference can be satisfied.

As to the subjective element, Titus argues his testosterone levels were dangerously low, and Defendants knew but continued to deny him treatment. (ECF No. 1-2 at 15.) Defendants argue Titus merely disagrees with the doctors and his testosterone levels are in the normal range. (ECF No. 29 at 6.)

Titus fails to show that Defendants acted with deliberate indifference when denying his requests for testosterone. An examination of Titus's progress notes and lab reports,[3] show Titus's testosterone levels were measured at 332 ng/dL on 3/15/16, 348 ng/dL on 8/3/16, and 329 ng/dL on 6/14/17. (*See* ECF Nos. 31-1, 31-4). As support for the motion for summary judgment, Defendants include a declaration from NDOC Medical Director Dr. Aranas. (*See* ECF No. 31-2.) In his declaration, Aranas states that "[n]ormal testosterone levels for adult males vary from 215-1200 ng/dL." (*Id.* at 2.) He states he has reviewed

---

[3] The LabCorp test results show Titus's testosterone levels being low, however, it appears reference levels were adjusted effective July 17, 2017, and the new reference interval for low testosterone in males over the age of 18 is 264-916 ng/dL, making Titus's test result within the "normal" range. (ECF No. 31-1 at 2-13.)

Titus's progress notes and lab results administered on March 15, 2016 (332ng/dL), August 3, 2016 (348ng/dL), and June 14, 2017 (329ng/dL), which show Titus's testosterone levels were in the normal range for a male of Titus's age. (*Id.*) Aranas further states that while Adamson initially requested testosterone treatment for Titus, the URC denied treatment because Titus's testosterone levels were normal. (*Id.*) Thus, the evidence in the record demonstrates that Defendants denied Titus's requests because his testosterone levels were normal and therefore TRT was not warranted. *See McCain v. Peters*, No. 2:13-cv-01632-AA, 2018 WL 3732660, at *3 (D. Or. Aug. 2, 2018), aff'd, No. 18-35766, 2019 WL 3321883 (9th Cir. July 24, 2019) (holding there was no deliberate indifference when denying plaintiff's requests because plaintiff's testosterone levels, 241.7 ng/dL, were only *slightly* below normal) (emphasis added); *Cf. Beitman v. Correct Care Solutions*, et al., No. CV 17-08229-PCT-JAT (DMF), 2020 WL 1911425, at *6 (D. Az. Apr. 20, 2020) (holding that there was deliberate indifference because the plaintiffs free testosterone levels were consistently *below normal*, even reported as "*below lower panic levels*") (emphasis added).

Further, even if Adamson said Titus was going to receive testosterone, and Aranas disagreed, disagreement between medical professionals is not enough to establish deliberate indifference. *Jackson*, 90 F.3d at 332. Having testosterone levels in a normal range would not lead a medical professional to infer that substantial harm would exist. *Colwell*, 763 F.3d at 1066.

In opposition, Titus failed to come forward with any evidence contradicting the results in his medical records or the information provided Dr. Aranas's declaration. Titus provides documents which were printed from the Internet and contain handwriting throughout the documents. These documents have not been authenticated. Therefore, the court cannot look to them for evidence and Titus has failed to meet his burden to establish an issue of fact. *See White by White v. Pierce County,* 797 F.2d 812, 815 (9th Cir. 1986) (stating unauthenticated documents cannot support opposition to motion for summary judgment).

9

Therefore, based on all the above, the court finds Defendants' motion for summary judgment should be granted as to the Eighth Amendment deliberate indifference claim.

### C.  Fourteenth Amendment – Equal Protection Violations

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. V. Cleburne Living Center*, 473 U.S. 432, 439 (1985). "A successful equal protection claim may be brought by a 'class of one,' when the plaintiff alleges that it has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *SeaRiver Maritime Fin. Holdings, Inc. v. Mineta*, 309 F.3d 662, 679 (9th Cir. 2002); *see also Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). To sustain an equal protection claim under this theory, plaintiff must establish that Defendants, "intentionally, and without rational basis, treated the plaintiff differently from others similarly situated." *North Pacifica LLC v. City of Pacifica*, 526 F.3d 478, 486 (9th Cir. 2008).

Titus does not allege or introduce any evidence that Defendants treated him different from other inmates. Specifically, he does not allege that Defendants provided testosterone for any inmates that had normal levels of testosterone.  Instead, Titus maintains that he is similarly situated to inmates Nall, who has a testosterone level of 30 ng/dL, and Hundley, who has been diagnosed with Klinefelter's Syndrome, both who are receiving hormone supplements.  *See McCain,* 2018 WL 3732660, at *4 (D. Or. Aug. 2, 2018), aff'd, No. 18-35766, 2019 WL 3321883 (9th Cir. July 24, 2019) (holding there was no equal protection violation because plaintiff did not produce any evidence that Dr. Shelton provided testosterone for inmates without Klinefelter Syndrome).

First, Titus is not similarly situated to either inmate Nall or Hundley.  As stated above, Aranas confirmed in his declaration that normal testosterone levels are in the range of 215-1200 ng/dL. (*See* ECF No. 31-2.)  Inmate Nall had a testosterone level of 30 ng/dL, well below the normal threshold of testosterone and 300 ng/dL less than Titus's testosterone levels. (*See* ECF No. 34 at 17.)  Inmate Hundley was diagnosed with "severe and persistent gender dysphoria/transsexualism and with a physical 'intersex' condition

10

called 'Klienfelter's (sic) Syndrome.'" (*See Id.* at 19.)   Klinefelter Syndrome is a condition in which a male has one Y chromosome and two X chromosomes. *Leatherbury v. C & H Sugar Co., Inc.,* 911 F.Supp.2d 872, 878 (N.D. Cal. 2012).  The symptoms of Klinefelter Syndrome include low sperm count, smaller than normal testicles, reduced muscle mass, reduced body and facial hair, and enlarged breast tissue. *Miskesell v. Berryhill*, Civ. No. 15-1026 GJF, 2017 WL 3608239, at *3 (D. N.M. Feb. 2, 2017).  Titus does not allege he was diagnosed with Klinefelter Syndrome, that he has an extra X chromosome, or even that his symptoms match those of Klinefelter.

However, even if Titus did have similar symptoms to Klinefelter, alleging similar symptoms is not enough to render him "similarly situated." *McCain,* 2018 WL 3732660, at *4 (D. Or. Aug. 2, 2018), aff'd, No. 18-35766, 2019 WL 3321883 (9th Cir. July 24, 2019). Finally, as discussed above, Defendants had a rational basis for not providing Titus with testosterone because his levels were in the normal range.

Therefore, for the above reasons, the court finds that Defendants' motion for summary judgement should likewise be granted regarding the Fourteenth Amendment Equal Protection claim.[4]

**IV.   CONCLUSION**

For good cause appearing and for the reasons stated above, the court recommends Defendants' motion for summary judgment (ECF No. 29) be granted and Titus's motion for new and updated testing (ECF No. 37) be denied as moot, in light of this Report and Recommendation

The parties are advised:

1.    Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, the parties may file specific written objections to this Report and Recommendation within fourteen days of receipt.  These objections should be entitled

---

[4] Because the court finds that no Eighth Amendment or Fourteenth Amendment violations occurred, it need not address Defendants' arguments related to personal participation or qualified immunity.

"Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2. This Report and Recommendation is not an appealable order and any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment.

## V. RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that Defendants' motion for summary judgment (ECF No. 29) be **GRANTED**;

**IT IS FURTHER RECOMMENDED** that Titus's motion for new and updated testing (ECF No. 37) be **DENIED** as moot; and

**IT IS FURTHER RECOMMENDED** that the Clerk **ENTER JUDGMENT** accordingly.

**DATED**: June 29, 2020.

_____
**UNITED STATES MAGISTRATE JUDGE**